## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LAURA HENRY,
Plaintiff,

No. 3:13-cv-826 (SRU)

v.

OLAKUNLE OLUWOLE,
Defendant.

## ORDER

In 2015, Laura Henry ("Henry") filed a motion for default judgment against Dr. Olakunle

Oluwole ("Dr. Oluwole") after he failed to answer claims raised against him in a 2013

complaint. Although District Judge Alfred V. Covello granted the motion for default judgment,

he postponed the hearing in damages pending resolution of the action against non-defaulting

defendants also named in the complaint. After the case was transferred to my docket, I held

hearings and reviewed evidence to determine the appropriate measure of damages to award prior

to entering final judgment. For the following reasons, Henry's request for an award of

$14,211,069.00 in compensatory and punitive damages is **granted** in part and **denied** in part.

### I.     Procedural History

The procedural history in this 2013 case is both lengthy and complex. Relevant here,

Henry originally filed suit against Dr. Oluwole, Bristol Hospital, and other unnamed defendants

on June 10, 2013, generally alleging that she had been subjected to a hostile work environment in

violation of Title VII and that Dr. Oluwole, a surgeon employed by the hospital, had sexually

assaulted her on hospital premises in 2011. *See* Compl., Doc. No. 1. Henry subsequently

amended the complaint on September 9, 2013. *See* First Am. Compl., Doc. No. 8. After Dr.

Oluwole failed to appear and answer the amended complaint, default was entered against him

pursuant to Federal Rule of Civil Procedure 55(a).  *See* Order, Doc. No. 51.  On September 22, 2015, Judge Covello granted Henry's motion for default judgment.  *See* Order on Mot. for Default J., Doc. No. 100, 103. Judge Covello declined, however, to determine damages at that time, instead continuing the hearing in damages until "after the determination of the claims against the remaining defendants."  *See* Order, Doc. No. 104.

Bristol Hospital, on the other hand, timely appeared and moved to dismiss the amended complaint in January 2014.  *See* Mot. to Dismiss, Doc. No. 17.  In September 2014, Judge Covello granted Bristol Hospital's motion in part, dismissing count one (alleging sexual harassment in violation of Title VII), count nine (alleging false imprisonment) and count ten (alleging intentional infliction of emotional distress).  *See* Ruling on Mot. to Dismiss, Doc. No. 37. Specifically, Judge Covello held that Bristol Hospital could not be held liable under a theory of respondeat superior on Henry's claims of false imprisonment and intentional infliction of emotional distress.  *Id.* Thereafter, Henry made several unsuccessful motions for leave to amend the complaint, ultimately filing a Fourth Amended complaint on March 28, 2016. *See* Doc. No. 122, Doc. No. 128. That complaint then became the operative pleading against Bristol Hospital. *See* Fourth Am. Compl., Doc. No. 128. In April 2016, Bristol Hospital moved successfully to dismiss counts one, eleven, and twelve of the Fourth Amended Complaint.  *See* Mot. to Dismiss, Doc. No. 140; Order on Mot. to Dismiss, Doc. No. 181.  The case was then transferred to my docket.  *See* Order of Transfer, Doc. No. 195.

In 2018, Dr. Oluwole appeared, and, through counsel, moved to set aside the default judgment.  *See*, Mot. to Set Aside Default, Doc. No. 257.  In light of evidence that the default had been willful, and additionally because of the significant period of time between the entry of

default judgment in 2015 and Dr. Oluwole's appearance in 2018, I denied his motion. *See* Ruling on Mot. to Set Aside Default J., Doc. No. 284.

In April 2018, following discovery, Bristol Hospital moved for summary judgment on the remaining counts of the Fourth Amended Complaint, including: two counts of negligent hiring, retention, and supervision (counts thirteen and fourteen); one count of negligence (count fifteen); and one count of negligence through agent or supervisor (count sixteen). *See* Mot. for Summ. J., Doc. No. 227. On March 25, 2019, I granted the motion for summary judgment only with respect to count sixteen. *See* Ruling on Mot. for Summ. J., Doc. No. 283. In October 2019, the case proceeded to trial against Bristol Hospital.

In my instructions to the jury at the close of trial, I specifically explained that in order for Bristol Hospital to be found liable, Henry needed to prove by a preponderance of the evidence that Dr. Oluwole engaged in tortious conduct. In particular, the jury needed to find that Dr. Oluwole had committed sexual assault, assault, or battery in order to return a verdict in Henry's favor. Trans. of Trial. 10.28.2019.[1] On October 28, 2019, the jury returned a verdict in favor of Bristol Hospital. *See* Verdict Form, Doc. No. 342. The verdict form reflects that the jury found that Henry had not proven by a preponderance of the evidence that Dr. Oluwole sexually assaulted, assaulted or battered her. *Id.*

Following the entry of judgment for Bristol Hospital, Dr. Oluwole again moved to vacate the default judgment, arguing that enforcing the judgment was inequitable in light of the jury verdict exonerating the hospital. *See* Mot. to Set Aside Default J., Doc. No. 345. In support of that argument, Dr. Oluwole cited to *Frow v. De La Vega*, an ancient Supreme Court case cautioning that where "a bill makes a joint charge against several defendants, and one of them

---

[1] Neither party has ordered the official transcript of the trial. This order relies on the unofficial transcript.

makes default" a court should not enter final judgment pending the disposition of the case on the merits against the non-defaulting defendants. 82 U.S. 552, 554 (1872). I initially declined to vacate the judgment, noting that the Second Circuit has narrowly interpreted the Supreme Court's holding in *Frow*, and additionally that Henry did not allege a true theory of joint liability against the defendants. *See* Ruling on Mot. to Set Aside Default J., Doc. No. 359.

Prior to awarding damages, I modified the judgment by vacating the counts of the complaint that were directly inconsistent with the jury's findings—specifically, the counts of the complaint alleging assault and battery. I determined that although *Frow* has been narrowly interpreted in this Circuit, that case and its progeny caution that a court should strive to avoid the entry of logically inconsistent judgments against defaulting and non-defaulting defendants. *See, e.g., Rivera v. Mattingly,* 2021 U.S. Dist. LEXIS 67539, at *13 (S.D.N.Y. Apr. 7, 2021) (vacating default judgment to avoid inconsistent judgments); *Chain v. North East Freightways, Inc.*, 2020 U.S. Dist. LEXIS 239307, at *55 (S.D.N.Y. Dec. 18, 2020) (same); *see also Farzetta v. Turner & Newall, Ltd.,* 797 F.2d 151, 154 (3d Cir. 1986) ("we believe that *Frow* stands for the proposition that if at trial facts are proved that exonerate certain defendants and that as a matter of logic preclude the liability of another defendant, the plaintiff should be collaterally estopped from obtaining a judgment against the latter defendant").

In my order modifying the judgment, I additionally considered Dr. Oluwole's objection to Henry's demand for damages associated with a stroke that she suffered in 2013.[2] After

---

[2] Although the First Amended Complaint makes reference to Henry's stroke, it was not clear from the allegations in the First Amended Complaint—or from Judge Covello's order granting default judgment—that damages associated with the stroke properly fell within "the limits of recovery according to injuries that were conceded by default." *Greyhound Exhibitgroup v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 159 (2d Cir. 1992). Accordingly, I held a hearing and considered evidence to determine whether those damages "naturally flow[ed] from the injuries pleaded." *Id.* In making that determination, I looked to Connecticut law to supply the substantive requirements for demonstrating a causal connection between injury and its later physical effects through the testimony of a treating physician to support an award of compensatory damages.

carefully considering the testimony of Henry's primary-care physician, Dr. Gary Miller, who testified at the second damages hearing held on October 23, 2020, I determined that Henry had failed to demonstrate that damages associated with her stroke were recoverable by virtue of the default judgment.  In particular, I focused on Dr. Miller's discussion of certain underlying conditions that might have predisposed Henry to suffering the stroke when she did.  In light of that determination, I held that Henry could not rely on exhibits reflecting damages associated with her stroke in support of her demand.

On June 1, 2021, I held a third and final damages hearing to allow Henry to present additional witness testimony and to offer Dr. Oluwole a further opportunity to contest the amount of damages claimed. Following that hearing, Henry submitted a second memorandum in support of her request for damages.  In that memorandum, Henry argues that she is entitled to recover a total of $14,211,069.00 in compensatory and punitive damages from Dr. Oluwole.[3] Dr. Oluwole has not specifically opposed that request, but instead argued at the third damages hearing that Henry should be awarded no damages after the verdict in favor of Bristol Hospital.[4]

In determining the appropriate measure of damages to award, I will rely on witness testimony presented at the damages hearings, as well as medical records, affidavits, and bills admitted as exhibits in conjunction with those hearings. The medical records, prepared during the course of treatment by medical providers who testified at the damages hearings, are properly admissible under Federal Rule 803(4) and 803(6).  *See, e.g., Boykin v. W. Express, Inc.,* 2016 U.S. Dist. LEXIS 14771, at *29 (S.D.N.Y. Feb. 5, 2016); *see also Romano v. Howarth*, 998 F.2d 101, 108 (2d Cir. 1993). Henry's affidavits are additionally admissible in support of her claim for

---

[3] Henry additionally seeks to add "eight new counts arising from Dr. Oluwole's conduct." Pl.'s Supp. Mem., Doc. No. 418 at 3. To the extent that Henry seeks leave to amend the complaint to add new counts against Dr. Oluwole in this eight-year-old case, that request is denied; default judgment has already entered.
[4] Both arguments are complicated by the fact that neither party has ordered the transcripts from any of the hearings.

damages, *see Antoine v. Brooklyn Maids 26, Inc.,* 489 F. Supp. 3d 68, 91 (E.D.N.Y. 2020)

(collecting cases), as is sworn witness testimony presented at those hearings. *Norcia v. Dieber's*

*Castle Tavern, Ltd.*, 980 F. Supp. 2d 492, 501 (S.D.N.Y. 2013).  By agreement of the parties, I

will also consider testimony and exhibits previously admitted at the jury trial against Bristol

Hospital. *See* Trans. of H'rg. 10.23.2020. For the reasons explained in my previous order, I will

not consider claims for damages associated with Henry's stroke.

## II.   Standard of Review

A party's default constitutes an admission of liability of "all well-pleaded factual

allegations contained in the complaint." *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114,

137 (2d Cir. 2011) (cleaned up); *see also Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).

Default, however, "is not considered an admission of damages. Damages, which are neither

susceptible of mathematical computation nor liquidated as of the default, usually must be

established by the plaintiff in an evidentiary proceeding in which the defendant has the

opportunity to contest the amount." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973

F.2d 155, 158 (2d Cir. 1992) (cleaned up); *see also Credit Lyonnais Securities (USA), Inc. v.*

*Alcantara,* 183 F.3d 151, 155 (2d Cir. 1999) (a "district court must…conduct an inquiry in order

to ascertain the amount of damages").

"Before granting a damages award on a default judgment, the district court must ensure

that the plaintiff has established the amount of damages to a 'reasonable certainty.'" *Hosking v.*

*New World Mortg., Inc.*, 570 F. App'x 28, 31 (2d Cir. 2014) (quoting *Credit Lyonnais*, 183 F.3d

at 155); *see also Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105,

111 (2d Cir. 1997).  Any award of damages must also be based on admissible evidence. *House*

*v. Kent Worldwide Mach. Works, Inc.*, 359 F. App'x 206, 207 (2d Cir. 2010). The scope of

damages that may be recovered is "measured by the principle of proximate cause. The default

judgment [does] not give [the plaintiff] a blank check to recover from [the defendant] any losses

it ha[s] ever suffered from whatever source." *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51,

70 (2d Cir. 1971), *rev'd on other grounds,* 409 U.S. 363 (1973). Instead, only the "damages that

naturally flow from the injuries pleaded" may be awarded. *Greyhound*, 973 F.2d at 159.

### III.   <u>Discussion</u>

A.   <u>The Complaint</u>

On September 22, 2015, Judge Covello granted Henry's motion for default judgment,

entering judgment with respect to liability against Dr. Oluwole on the First Amended

Complaint.[5] *See* Default J., Doc. No. 100; Ord. on Mot. for Default J., Doc. No. 103. In that

complaint, Henry raised eleven claims against Dr. Oluwole, including:

> **Count Two**: Battery;
> **Count Three**: Assault;
> **Count Four**: Battery;
> **Count Five**: Battery;
> **Count Six**: Battery;
> **Count Seven**: Battery;
> **Count Eight**: Battery;
> **Count Nine**: False Imprisonment as against defendants Oluwole and Bristol Hospital;
> **Count Ten**: Intentional Infliction of Emotional Distress as against Defendants Oluwole and Bristol Hospital;
> **Count Eleven**: Negligent Infliction of Emotional Distress as against Defendant Oluwole and Bristol Hospital; and
> **Count Fifteen**:  Negligence as Against Defendant Bristol Hospital by and through its' Agent/Supervisor Defendant Oluwole.

*See* First Am. Compl., Doc. No. 8. Henry additionally sought "damages pursuant to the common

law of the State of Connecticut." *Id.*

---

[5] Although Judge Covello granted Henry's motion, that order was not a final entry of judgment because the damages inquest was postponed pending the resolution of Henry's claims against Bristol Hospital. *See Henry v. Oluwole,* 799 F. App'x 87, 88 (2d Cir. 2020) (summary order).

In my previous order, I vacated the entry of default judgment with respect to the counts alleging assault and battery—counts 2-8 of the First Amended Complaint—on the grounds that it would be incongruous to impose liability on those counts in light of the jury's finding.[6]  I declined, however, to vacate the judgment with respect to the claims for negligent infliction of emotional distress, intentional infliction of emotional distress, false imprisonment, and negligence because those claims were not directly inconsistent with the jury's verdict.[7]  Although allegations in those counts overlap to a degree with Henry's allegations of sexual assault, those claims are distinct theories of liability that were not considered by the jury. *See, e.g., Chain,* 2020 U.S. Dist. LEXIS 239307 at *55 (vacating default judgment to avoid inconsistent result where plaintiff's "*only* theory of liability" had not been proven at trial) (emphasis in original).

B.  Damages

Under Connecticut law, a plaintiff who establishes liability for an action sounding in tort may recover compensatory damages, or damages that "will reasonably compensate her for all injuries or losses that [the plaintiff] has proved she has suffered."  *Grisanti v. Cioffi*, 2001 U.S. Dist. LEXIS 14358, at *5 (D. Conn. June 14, 2001); *see also Kenny v. Civil Serv. Com.,* 197 Conn. 270, 276 (1985) ("The purpose of compensatory damages is to restore an injured party to the position he or she would have been in if the wrong had not been committed.").  A plaintiff may recover both "economic damages" to compensate concrete loss, such as medical expenses or

---

[6] As previously noted, some of my prior orders and Henry's briefs erroneously identify the complaint on which default judgment was entered as the Fourth Amended Complaint. The First Amended Complaint is the complaint on which Judge Covello entered default judgment; the counts previously vacated are the counts alleging assault and battery (counts 2–8). *See* First Am. Compl., Doc. No. 8.

[7] I note that it is somewhat unclear whether Count Fifteen—alleging negligence—is raised against the hospital alone or against the hospital and Dr. Oluwole. Because the allegations in that count appear to allege negligence against Dr. Oluwole in addition to Bristol Hospital, and because the jury made no findings with respect to Dr. Oluwole's negligence, I declined in my previous order to vacate that count.

lost wages, as well as "noneconomic damages such as pain and suffering." *Giordano v. Giordano*, 39 Conn. App. 183, 207 (1995).  Economic damages generally require a fairly clear estimation of costs; noneconomic damages, which are more subjective, need not be proven with that same level of precision. *Id.; see also Carrano v. Yale-New Haven Hosp.,* 279 Conn. 622, 650 (2006) ("[p]roof of damages should be established with reasonable certainty and not speculatively") (cleaned up). Although the measure and type of damages that may be awarded is governed by the allegations and theories of liability set forth in the complaint, a plaintiff may recover "only once for his just damages for the same injury."  *Rowe v. Goulet*, 89 Conn. App. 836, 849 (2005) (cleaned up).

Connecticut law also provides for the recovery of punitive damages where "the evidence…reveal[s] a reckless indifference to the rights of others or an intentional and wanton violation of those rights."  *Venturi v. Savitt, Inc.*, 191 Conn. 588, 592 (1983); *see also West Haven v. Hartford Ins. Co.,* 221 Conn. 149, 160-61 (1992) (defining wanton conduct as "such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action" and noting "[i]f this element is present, an actual intention to do harm to the plaintiffs is not necessary") (cleaned up).  Punitive damages are limited, however, to "expenses of litigation less taxable costs," including attorneys' fees. *Berry v. Loiseau*, 223 Conn. 786, 827 (1992); *see also Grisanti,* 2001 U.S. Dist. LEXIS 14358 at *35.

1.     Compensatory Damages

A.     Economic Damages

In her most recent brief in support of her claim for damages, Henry contends that she is entitled to recover damages to compensate her for various paid and unpaid medical bills; pharmacy bills; the future costs of surgical procedures to treat complications resulting from her

2013 stroke; and the future costs of therapy. *See* Pl.'s Sup. Mem., Doc. No. 418 at 20–22. In a

separate portion of her brief, Henry additionally seeks to recover $2,160,000.00 to compensate

her for lost wages and loss of future earning capacity, relying on W-2 forms from the 2010–2012

period, affidavits and the report and trial testimony of an economics expert who prepared a lost

earnings analysis. *See id.* at 11. Finally, she demands compensation for a loan obtained in 2015

that has now compounded to reach a total of $210,000. *Id.* at 12. I consider those claims in turn.

      i.    Medical Expenses

In support of her claim for medical expenses, Henry directs me to her "List of Claimed

Damage Related Items." *See* Pl.'s Ex. 46, Doc. No. 407-20. As an initial matter, in my previous

order prior to the final damages hearing, I determined that Henry had failed to demonstrate that

damages for the stroke she suffered in 2013 fell within the scope of damages recoverable by

virtue of the default judgment. Despite my directive that Henry should not rely on exhibits

reflecting costs associated with her stroke in support of her claim for damages, Henry includes

those costs in her most recent demand. In my review of the medical bills submitted, I will

therefore attempt to differentiate the costs associated with her stroke from those that are

unrelated, some of which Henry has identified in her list of claimed damages. *See id*.

In that document, Henry appears to claim entitlement to compensation for the following

medical expenses that accrued prior to her stroke:

> (1) costs for treatment at John Dempsey Hospital on one occasion in 2013;
> (2) costs for treatment by therapist Mary Marsh;
> (3) costs for treatment by her primary care doctor, Dr. Gary Miller between June 2013 and April 2014;
> (4) costs for treatment at the Connecticut Anxiety and Depression Treatment Center ("CADTC");
> (5) costs for treatment at Bristol Orthopedics between 2012 and 2018; and
> (6) costs for medical insurance premiums owed to Bristol Hospital during the period Henry was receiving disability payments.

*Id.* Although those costs purportedly predate Henry's stroke, many of the dates reflected in those bills occurred after the date of the stroke. Further complicating the picture, Henry has not provided additional detail regarding the care she received at Bristol Orthopedics or at John Dempsey Hospital on the date referenced, nor has she explained how those costs relate to injuries deemed admitted by virtue of the default judgment. With respect to the claim for compensation for the cost of insurance premiums during the period she was receiving disability, Henry provides only a letter informing her of the outstanding balance as of March 6, 2014, which appears to include a balance due for the period following her stroke. *See* Pl.'s Ex. 11, Doc. No. 367-14 at 38. It is therefore not clear how any of those claimed expenses properly relate to conduct at issue in this lawsuit. *See, e.g., Glassman-Brown v. Pouring Wine, LLC,* 2016 U.S. Dist. LEXIS 28167, at *6 (S.D.N.Y. Feb. 29, 2016), *report and recommendation adopted,* 2016 U.S. Dist. LEXIS 46249 (S.D.N.Y. Apr. 5, 2016) (awarding medical costs in default judgment where plaintiffs "submitted certified copies of medical records and bills from the facilities where plaintiff…was treated for…injuries sustained *as a result of her encounter* with the defendant's [device]") (emphasis added); *Gissinger v. Yung*, 2007 U.S. Dist. LEXIS 102373, at *14 (E.D.N.Y. June 28, 2007) *report and recommendation adopted*, 2007 U.S. Dist. LEXIS 55533 (E.D.N.Y. July 27, 2007) (refusing to consider information that "has no bearing on the injuries giving rise to this action" in awarding damages); *see also Greyhound*, 973 F.2d at 158.

In support of her request to recover costs for treatment with Dr. Miller, Henry points me to Dr. Miller's testimony, as well as to Dr. Miller's extensive treatment records, submitted as an exhibit in advance of the second damages hearing. At that hearing, held on October 23, 2020, Dr. Miller testified that he practiced internal medicine, and that he had been Henry's primary care physician for over a decade, since at least 2011. Trans. of H'rg. on Damages, 10.23.2020.

As her primary-care physician, he provided treatment for both mental and physical health issues, including anxiety, depression, panic attacks and post-traumatic stress disorder ("PTSD"). *Id.* Specifically, Dr. Miller testified that Henry shared with him that she had been sexually assaulted by a doctor at Bristol Hospital and that she was experiencing symptoms of PTSD. *Id.* He further recalled discussing with Henry that those symptoms were exacerbated by the stress of repeatedly interacting with the doctor at work. *Id.* At some point in 2011, Dr. Miller referred Henry to a psychologist for a consult regarding those mental health conditions. *Id.* Dr. Miller's records similarly reflect that Henry was diagnosed with PTSD, anxiety, and depression, and that he prescribed her various medications to treat those conditions. *See* Pl's. Ex. 61, Doc. No. 408-17.

Relying on those records and Dr. Miller's testimony, Henry has clearly demonstrated that Dr. Miller treated her for her various mental health conditions, and also that he was aware of the trauma Henry experienced each time she was forced to interact with Dr. Oluwole at work. However, Dr. Miller's testimony and records additionally reflect that, as a primary-care physician, he treated Henry for a wide range of mental and physical health conditions; treatment for anxiety, depression and PTSD was simply one element of that care. Further, Dr. Miller testified that he treated Henry in the aftermath of her 2013 stroke, and Henry has made no effort to delineate the costs of treatment associated with her stroke in her claim for damages. In my view, the fact that Dr. Miller provided Henry some treatment for the trauma and mental health conditions exacerbated—or even caused—by working in close proximity with Dr. Oluwole does not afford a sufficient basis for awarding damages for all primary care visits during 2013 and 2014.

Finally, Henry seeks to recover damages to compensate her for the costs of treatment by various therapists beginning in 2012. Specifically, Henry submits billing records from treatment

sessions with a provider named Mary Marsh and with various providers at CADTC, including Graznya Salus. *See* Pl.'s Ex. 46, Doc. No. 407-20. Those billing records, however, are submitted in bits and pieces, and Henry provides me with no total sum for costs purportedly incurred. First, with respect to treatment at CADTC, Henry submits two separate sets of billing records, the first of which was apparently generated by her provider on April 8, 2014. *See* Pl.'s Ex. 11, "Assorted Bills", Doc. No. 367-14 at 45-47. That first set of records appears to reflect that she owes $310.00 for treatment between June 25, 2013 and March 26, 2014. *Id.* In a separate exhibit, however, Henry submits an itemized statement of charges from CADTC from March 31, 2020. *See* Pl.'s Ex. 31, Doc. No. 407-6. Those records reflect charges and insurance payments for treatment with various providers between January 22, 2013 and December 11, 2018; the amount paid by either Henry or her insurance company appears from that document to be $3,477.50, with an outstanding balance of $985.00. *Id.* In her list of claimed damages, however, Henry indicates that she owes $5,150.00 in total, which appears to reflect the sum of the insurance adjustment included in those billing records. *See* Pl.'s Ex. 46, Doc. No. 407-20; *see also id.* It is therefore unclear to me what measure of damages Henry is seeking to compensate her for treatment at CADTC.

Further, Henry has included bills for dates of treatment on various dates following her stroke and makes no attempt to identify costs accrued prior to that date. *Id.* Significantly, Grazyna Salus, a provider who treated Henry through CADTC and testified at the final damages hearing, recalled that the stroke greatly impacted Henry's mental health and that much of the treatment Salus provided had focused on the debilitating effects of that stroke. Trans. of H'rg. 06.01.2021. That testimony makes it difficult to determine that costs for treatment through 2018

fall within the scope of damages properly recoverable by virtue of the default judgment. *See, e.g., Hughes,* 449 F.2d at 70.

Henry's claim for damages to compensate her for the costs of treatment with therapist Mary Marsh is similarly unclear. In support of that claim, Henry provides records—purportedly from Marsh's office—reflecting that Henry was seen on six separate dates for treatment. *See* Pl.'s Ex. 28, Doc. No. 407-3; Pl.'s Ex. 47, Aff. of Laura Henry. According to those records, three of Henry's treatment sessions were paid for in full by the Wheeler Clinic Employee Assistance Program; three were paid in part by her insurance. *See id.* It is not clear from Henry's submission, however, whether she seeks reimbursement for the copay only or for the full cost of those sessions. *See id.; see also* Pl.'s Ex. 46, Doc. No. 407-20. Further, to the extent that Henry is claiming compensation for the cost of the copay, the amount incurred according to Marsh's records and the amount reflected in the provider remittance form that Henry submits differ. *See* Pl.'s Ex. 28, Doc. No. 407-3.

In light of those deficiencies—particularly noteworthy given the numerous opportunities afforded to counsel for Henry to clarify and support her claim for damages—I decline to award damages to compensate Henry for those medical costs. *See, e.g., Lewis Family Grp. Fund Lp v. Js Barkats Pllc,* 2021 U.S. Dist. LEXIS 62810, at *15 (S.D.N.Y. Mar. 31, 2021) ("if a plaintiff fails to demonstrate its damages to a reasonable certainty, then the court should decline to award any damages, even where liability has been established through default") (cleaned up).

ii.   Costs of Medication

Henry additionally claims that she is entitled to compensation for the cost of various prescription medications that she purchased between 2013 and 2020. Although the cost of that medication totaled $130,164, she indicates that those costs were covered at least in part by the

State of Connecticut; however, Henry must reimburse the state for $3,169.07 if she is awarded

damages in this lawsuit.  *See* Pl.'s Mem. Doc. No. 418 at 21; Pl.'s Ex. 47, Aff. of Laura Henry,

Doc. No. 407-21 at ¶ 31.  She therefore requests $20,000 in damages, purportedly to compensate

her for the amount she will have to pay back to the state of Connecticut for past and any future

costs of medication.  In support of her claim, Henry submits copies of Rite Aid Pharmacy bills,

which identify the name of each medication Henry was taking and the amount she paid to

purchase the medication on various dates between 2014 and 2020.  *See* Pl.'s Ex. 27 Doc. No.

407-1, 407-2.  She additionally directs me to her affidavit, in which she provides:

> Due to the injuries I suffered resulting from Defendant Oluwole's assault, I have filed [sic]
> all my medication prescriptions from Rite Aid Pharmacy. I believe to date, my bill is
> around $130,164.16, $3,169.07 of which I am required to pay back from any recovery,
> because the payments are made by the State of Connecticut.

Pl.'s Ex. 47, Aff. of Laura Henry, Doc. No. 407-21 at ¶ 31.

As an initial matter, many of those bills reflect costs that Henry incurred after the date of

her stroke. Pl.'s Ex. 27 Doc. No. 407-1, 407-2; *see also* Pl.'s Ex. 46, Doc. No. 407-20.

Additionally, although Dr. Miller testified at the second damages hearing that he prescribed

Henry some of the medications reflected in the Rite Aid billing records for anxiety or panic

attacks, he explained that others were related to treatment for symptoms associated with her

stroke or for other unrelated medical issues. *See* Trans. of H'rg. on Damages, 10.23.2020.

Moreover, Henry has provided no additional detail to support her claim that she will continue to

incur the same costs for medication in the future. Accordingly, I am unable to award the cost of

those prescriptions as damages. *See, e.g., Hernandez v. Apple Auto Wholesalers of Waterbury

LLC*, 460 F. Supp. 3d 164, 177 (D. Conn. 2020) ("[a] court may not just accept a plaintiff's

statement of the damages, even in a default judgment") (cleaned up).

iii.    Future Medical Costs

Henry also demands damages in the measure of $4,000 per year until she reaches the age of 80 to compensate her for future costs of therapy.  *See* Pl.'s Brief, Doc. No. 418 at 21. However, Henry provides no additional detail or documentary support to substantiate the claim that she will incur those costs annually.  For example, she offers no information to indicate how often she would need to attend therapy or whether the costs of that treatment would be commensurate with the previous costs of therapy.  Moreover, as discussed, the stroke she suffered additionally makes it difficult to conclude that the future costs of therapy reasonably arise from "acts and injuries pleaded" in the complaint.  *Hughes*, 449 F.2d at 70.  Accordingly, the request for compensation for the annual cost of therapy in the measure of $80,000.00 is denied.

       iv.   <u>Lost Wages</u>

Henry additionally claims that she is entitled to damages to compensate her for lost wages and loss of future earning capacity.  In support of that claim, Henry points me to her W-2 Wage and Tax Statement forms from 2010–2013, which reflect a significant drop in income between wages earned in 2011 and wages earned in 2012 and 2013.  *See* Pl.'s Ex. 44, W-2 Wage and Tax Statements, Doc. No. 407-18.  Henry additionally submits the report of an expert witness who testified at trial and conducted an analysis of lost earnings based on her previous position at Bristol Hospital.  *See* Pl.'s Ex. 20, Dolde Report, Doc. No. 367-30.

 Henry has failed, however, to establish those damages with reasonable certainty.  As an initial matter, she does not clearly explain the income decline, indicating only that "her income fell dramatically after she was victimized by Defendant Oluwole."  Pl.'s Supp. Mem., Doc. No. 418 at 10.  Although she sets forth evidence that the anxiety and symptoms of PTSD that she experienced in the aftermath of the 2011 surgery were so severe that she was ultimately forced to

16

go on short-term disability, it appears that she did not do so until early 2013.  *See* Pl.'s Ex. 47,

Aff. of Laura Henry, Doc. No. 407-21 at ¶ 15; Pl.'s Ex. 43, Statement of Claim for Short-Term

Disability Benefits, Doc. No. 407-17.  Further, although Henry has provided a copy of an

application for short-term disability completed on April 23, 2013, it is unclear what measure of

damages she seeks to compensate her for lost wages during the period she was receiving short-

term disability prior to the onset of her stroke.[8]  Pl.'s Supp. Mem., Doc. No. 418 at 10; *see also*

*id.*

Henry's claim for loss of future earning capacity is similarly unsupported.  In particular,

Henry asks me to calculate lost earning capacity based on the marked increase in income that she

claims would have resulted from completing her bachelor's degree in hospital management (a

degree she was pursing online in 2011), and subsequently obtaining a master's degree. *Id.* at 10;

*see also* Trans. of H'rg. 6.1.2021. Henry maintains that "[b]ut for Defendant Oluwole

victimizing Ms. Henry on June 11, 2011, it is likely she would have completed her master's

degree, secured employment in her chosen field of Hospital Management in 2015 and earned

between $120,000.00 and $144,000.00 annually. Based on those projections….in 2030 (2015 to

2030), she would have earned $2,160,000.00**.**" *Id.* That argument, however, is far too attenuated

to provide a reasonable basis for awarding damages, especially considering the stroke that Henry

suffered in 2013.  *See, e.g., Hoadley v. Univ. of Hartford,* 176 Conn. 669, 675 (1979) (in order to

award damages for loss of future earning capacity "courts require…that the evidence, with such

certainty as the nature of the particular case may permit, lay a foundation which will enable the

---

[8] The report prepared by Dr. Dolde provides the present value of lost earnings since 2012 and provides no additional clarity with respect to lost wages during the period Henry received short-term disability. Further, those calculations are based on the assumption that Henry will be unable to work for the rest of her life and therefore appear to factor in the effects of her 2013 stroke. Trans. of Trial 10.25.19.

trier to make a fair and reasonable estimate"); *see also Berndston v. Annino*, 177 Conn. 41, 47 (1979).

Accordingly, Henry's demand for $2,160,000.00 to compensate her for lost wages and loss of future earning capacity is denied.

> v.    Loan

Henry additionally seeks to recover damages from Dr. Oluwole to compensate her for a loan she took out in August 2015 which has now compounded to reach $210,0000.00.  Pl.'s Mem., Doc. No. 418 at 12; *see also* Pl.'s Ex. 41 Doc. No. 407-15, Ex. 48 Doc. No. 407-22. Henry provides no additional detail, however, from which I can conclude that obtaining a loan in 2015 falls within the bounds of permissible recovery on a default judgment entered for tortious conduct that occurred in 2011, providing only that as a result of the injuries that she suffered and the shortfall in her salary, she "was forced to apply for a loan in August 2015, to assist [her] in paying [her] bills." Pl.'s Ex. 47, Aff. of Laura Henry, Doc. No. 407-21 at ¶ 33. Accordingly, Henry's request for damages to compensate her for the cost of repaying that compounded loan is denied.[9]

> B.    Non-Economic Damages

Henry additionally claims that she is entitled to $5,000,000 in non-economic damages.  In support of that claim, she contends that as a result of Dr. Oluwole's conduct, she suffered severe emotional distress, "developed severe panic attacks, depression, anxiety, and PTSD" and that those conditions manifested in physical symptoms including insomnia, blurred vision, tremors,

---

[9] Although Henry references a lien from the State of Connecticut Department of Administrative Services in the amount of $19,643.73, it is not clear to me whether she is claiming that she is entitled to damages to compensate her for repaying that lien. To the extent that she does claim entitlement for compensation to repay the lien, she has failed to demonstrate how that lien falls within the scope of damages recoverable in this action. *See, e.g., Hughes*, 449 F.2d at 70.

and body aches.  Pl.'s Mem. Doc. No. 418 at 16.  Henry additionally appears to claim

entitlement to damages for pain and suffering associated with her stroke. *Id.*  For the reasons

explained in my previous order, I will limit my review of Henry's claim to damages for

emotional distress.

Fashioning an appropriate measure of damages to award for emotional distress is always

a difficult task—there is, of course, no figure that can truly "compensate" for psychological

harm, nor is such harm readily reduced to a numerical figure.  In attempting to determine an

appropriate measure of damages to award in this unique case, I am guided by damages awarded

by Connecticut courts, and will additionally carefully consider the testimony and exhibits that

Henry has presented in support of her claim.

Under Connecticut law, "an award of damages for emotional distress may be valid even

though it is not substantially based on incurred medical expenses."  *Berry v. Loiseau*, 223 Conn.

786, 811 (1992) (cleaned up).  Connecticut courts, however, have generally upheld more

significant awards of noneconomic damages where a plaintiff has set forth evidence that a

defendant's conduct caused or contributed to the onset of mental health issues that required

treatment, or suffered physical symptoms in conjunction with emotional distress.  *See, e.g.,*

*Gaudio v. Griffin Health Servs. Corp.*, 249 Conn. 523, 552 (1999) (upholding award of $100,000

where plaintiff demonstrated that he was "emotionally devasted…[and] lost a substantial amount

of weight"); *Kuselias v. S. New England Tel. Co.*, 1996 Conn. Super. LEXIS 2829, at *45

(Super. Ct. Oct. 25, 1996) (upholding award of $380,000 for emotional distress where plaintiff

set forth evidence that he suffered anxiety and physical symptoms as a result of the defendant's

conduct).

This district court has similarly considered the extent of physical symptoms and the severity of the emotional distress in awarding emotional distress damages, loosely categorizing those claims as "garden-variety, significant, [or] egregious." *Vera v. Alstom Power, Inc.,* 189 F. Supp. 3d 360, 376 (D. Conn. 2016) (cleaned up); *see also Powell v. Jones-Soderman,* 433 F. Supp. 3d 353, 379 (D. Conn. 2020) (collecting cases). Garden-variety emotional distress claims involve somewhat limited evidence of mental suffering that is usually cabined to a plaintiff's own testimony; in contrast, establishing significant emotional distress generally requires evidence of treatment by a healthcare professional or corroborating witnesses. *Vera*, 189 F. Supp. 3d 360 at 376. Finally, "egregious emotional distress claims generally involve…a significant impact on the physical health of the plaintiff." *Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 47 (E.D.N.Y. 2009) (cleaned up). The measure of damages awarded is generally commensurate with the severity of the emotional distress shown; higher awards are appropriate in cases where the emotional distress is severe or egregious. *Id.*; *see also Walker v. Dickerman*, 993 F. Supp. 101, 106 (D. Conn. 1997) (awarding $750,000 in compensatory damages after entry of default on claims of negligent assault, intentional assault, negligent infliction of emotional distress, and intentional infliction of emotional distress where plaintiff suffered lasting emotional harm and sought therapy); *Antoine*, 489 F. Supp. 3d at 97 ("where the physical health of plaintiff was significantly affected, damages have been awarded in excess of $100,000") (cleaned up); *Parris v. Pappas*, 844 F. Supp. 2d 271, 279 (D. Conn. 2012) (awarding $100,000 where emotional distress was "at least significant rather than merely garden-variety").

During the course of trial and in conjunction with the three damages hearings in the case at bar, Henry has submitted extensive evidence of the significant mental and emotional distress she experienced as a result of Dr. Oluwole's conduct. She has additionally provided

corroborating evidence of her emotional distress, setting forth the testimony and medical records of her primary care physician and two therapists from whom she received treatment. Each of those medical providers testified that after the 2011 surgery by Dr. Oluwole, Henry developed PTSD, and experienced severe anxiety and depression. *See* Trans. of H'rg. 10.23.2020; Trans. of H'rg. 06.01.2021. Treatment records of those providers further substantiate their testimony with notes taken contemporaneously during Henry's treatment sessions. *See* Pl.'s Ex. 61, Treatment Records of Dr. Miller, Doc. No. 408-17; Pl.'s Ex. 6, Notes of Danielle Greco, Doc. No. 367-9; Pl.'s Ex. 51, Notes of Grazyna Salus, Doc. No. 407-25.

Significantly, those providers classified Henry's anxiety and depression as severe, explaining the ways that her symptoms interfered with her ability to function at home and at work. For example, Salus detailed the frequent and debilitating panic attacks that Henry regularly experienced, and explained how those panic attacks interfered with her work and personal life. Trans. of H'rg. 06.01.2021. Therapist Danielle Greco similarly explained how difficult it had been for Henry to feel unsafe at work, a place that she had felt at home both socially and professionally for over two decades. Trans. of H'rg. 10.23. 2020. Both providers attributed the onset of a significant portion of Henry's symptoms and mental health decline to Dr. Oluwole's conduct and to the traumatizing experience of working in close proximity with him at Bristol Hospital following the 2011 surgery. Trans. of H'rg. 06.01.2021; 10.23.2020.

Henry's daughter, Monica Searchwell, additionally testified in great detail at the final damages hearing and at trial with regard to the emotional distress Henry experienced. Searchwell explained that she and her mother had always been very close, and spoke very frequently, often on a daily basis. Trans. of H'rg. 06.01.21. Sometime around June or July of 2011, Searchwell noticed changes in Henry's behavior and demeanor; Henry seemed depressed, anxious and

weepy. *Id.* She isolated herself, withdrawing from family and friends, including her beloved

grandchildren, at times refusing to leave her room for days on end. *Id.* Searchwell described

how painful it had been to see such drastic changes in her formerly independent and outgoing

mother, and related that at one point, she became concerned that Henry might harm herself.

Trans. of H'rg. 06.01.2021.

Lynne Ramer, Henry's former co-worker who testified at trial, similarly related that she

had noticed a marked difference in Henry's mental health and overall well-being after the

surgery with Dr. Oluwole. Trans. of Trial, 10.23.19, Testimony of Lynne Ramer. In her

statement to the Connecticut Department of Public Health, Ramer explained:

> After [Laura's] surgery with Dr. Oluwole, she became a different person. Prior to the
> surgery, [Laura] was a friendly and outgoing person. After the surgery, [Laura] was
> distance [sic] and contained. She was often hesitant to go upstairs to the operating room
> and would not go unless she had someone go with her.

Pl.'s Ex. 3, Ramer Stmt., Doc. No. 367-6.

Finally, Henry herself testified at trial with respect to the emotional distress that she had

experienced, explaining how incredibly stressful it had been for her to continue work with Dr.

Oluwole, and how painful it had been for her to feel uncomfortable in a place that she had loved

working for over two decades. Trans. of Trial 10.24.2019. She described in detail the panic

attacks, depression, anxiety, and PTSD that she experienced, and explained that she felt unsafe

even in her own home. *Id.*

Considering the extensive evidence Henry has submitted to substantiate the severity of

her symptoms and the degree to which those symptoms impacted her ability to work and her

relationships with friends and family, I will award $100,000 in compensatory damages for

emotional distress.

2.      Punitive Damages

Finally, Henry seeks to recover $5,000,000 in punitive damages from Dr. Oluwole. In

support of that claim, she argues that Dr. Oluwole has engaged in a repeated pattern of egregious

misconduct throughout the course of his career as a doctor, citing to allegations of sexual

misconduct at Rochester Medical Center in 1999 and Warren General Hospital in 2006.  *See*

Bristol Hospital's Ex. N, Oluwole Employment File; Pl.'s Ex. 4, Warren Hospital Note, Doc. No.

367-7; Trans. of Trial 10.25. 2019 (testimony of Leonard Banco); 10.22.2019 (testimony of

Olakunle Oluwole).  Henry additionally notes that Dr. Oluwole was ultimately terminated from

Bristol Hospital in 2012 for repeated instances of sexual misconduct. In particular, she cites to

the termination letter sent to Dr. Oluwole by Bristol Hospital, which reads:

> Your employment is terminated based upon your repeated acts of misconduct
> with female staff and a patient of Bristol Hospital…about which you have
> been counseled on several occasions.

*See* Pl.'s Ex. 2, Termination Letter, Doc. No. 367-5; *see also* Bristol Hospital's Ex. U, Ashley

Blanchette letter; Ex. W, Mary Smith Letter; Ex. X (Dr. Kaye Letter).[10]  Relying on that

evidence, Henry maintains that "Oluwole's sustained, egregious, repeated and serious

misconduct, merged with his cavalier attitude towards the damaging consequence of his acts"

entitle her to recover punitive damages in the form of attorneys' fees and litigation costs. *See*

Pl.'s Mem., Doc. No. 418 at 26.

As an initial matter, in order to demonstrate that she is entitled to punitive damages,

Henry may not merely rely on the allegations deemed admitted by virtue of the default judgment.

*Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974).  Rather, Henry must point to evidence

demonstrating that Dr. Oluwole's conduct evinced—at the least—reckless indifference to her

rights. *Berry*, 223 Conn. at 811.  Although Henry has submitted a wealth of evidence

---

[10] Bristol Hospital's exhibits were not filed on the docket and this order therefore refers to hard copies in the Court's possession, which the parties have agreed are available for my consideration.

demonstrating that Dr. Oluwole has been repeatedly accused of sexual misconduct or assault by many other women throughout his career as a surgeon, those prior allegations simply do not afford a basis for awarding punitive damages in *this* lawsuit.  *See, e.g., Collens v. New Canaan Water Co.*, 155 Conn. 477, 489 (1967) (affirming award of punitive damages "[t]he injuries *to the plaintiffs* were inflicted in a spirit of wanton disregard of their rights") (emphasis added); *see also Walker*, 993 F. Supp. at 106 (awarding punitive damages after default judgment because "the evidence before the court shows that the defendant's conduct was outrageous and the defendant was at least recklessly indifferent to [the plaintiff's] rights").  Because Henry has failed to make that showing, the request for an award of punitive damages is denied.

**IV.**   **Conclusion**

For the foregoing reasons, Henry's request for damages is **granted** in part and **denied** in part.  The Clerk is directed to enter judgment for Henry and against Dr. Oluwole in the total amount of $100,000.00.  Henry may make a motion for costs under Rule 54(d) within fourteen days from the entry of judgment.

So ordered.

Dated at Bridgeport, Connecticut, this 28th day of September 2021.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge